## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CASE NO. 3:22-CV-147-RJC-DCK

| | | |
|---|---|---|
| MOVEMENT MORTGAGE, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| INTERCONTINENTAL CAPITAL GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| INTERCONTINENTAL CAPITAL GROUP, INC., | ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MOVEMENT MORTGAGE, LLC, MATT | ) | |
| DREXLER, and LAURA ASHLEY BROOKS, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |
| _____ | ) | |

**THIS MATTER IS BEFORE THE COURT** on "Movement Mortgage, LLC's Motion

To Compel Discovery" (Document No. 41) filed August 3, 2023; "Movement Mortgage, LLC's

Motion To Enforce Subpoena Directed To Third-Party Daniel Wilson" (Document No. 49)

January 24, 2024; and "Movement Mortgage, LLC's Motion For Sanctions…" (Document No.

57) filed February 13, 2024. These motions have been referred to the undersigned Magistrate

Judge pursuant to 28 U.S.C. § 636(b), and are ripe for disposition. Having carefully considered

the motions and the record, the undersigned will <u>grant</u> in part and <u>deny</u> in part Movement's requests for relief.

## I. BACKGROUND

Movement Mortgage, LLC ("Movement" or "Plaintiff") and forty-eight (48) individuals ("Individual Plaintiffs") (collectively, "Plaintiffs") initiated this action with the filing of a "Complaint For Declaratory Relief" (Document No. 1) (the "Complaint") on April 6, 2022. Individual Plaintiffs are former employees of Intercontinental Capital Group, Inc. ("ICG" or "Defendant"). (Document No. 1, p. 2).

Plaintiff Movement is "a national leader in the mortgage loan origination industry." (Document No. 1, p. 4). Defendant ICG is in " a relationship-driven business line like Movement," and "has a business line focused on what is referred to in the industry as direct-to-consumer lending." (Document No. 1, p. 5). ICG's "model is focused on sending marketing materials directly to potential customers who then contact ICG about a potential home purchase or refinance." <u>Id.</u>

The Complaint notes that Movement and ICG engaged in discussions between November 2021 and February 2022, "about Movement possibly purchasing ICG's direct-to-consumer line of business." (Document No. 1, p. 5). Plaintiffs contend that ICG "refused to provide Movement with basic financial and performance data necessary for Movement to evaluate ICG's direct-to-consumer business." (Document No. 1, p. 6). In addition, the Complaint avers that "business conditions at ICG had very rapidly deteriorated" during late 2021, forcing ICG "to lay off approximately half of its employees and to shutter most of its offices besides its Charlotte, North Carolina branch." <u>Id.</u> In mid-February 2022, the parties' negotiations were terminated by ICG. (Document No. 1, p. 7).

According to Plaintiffs, "[a]bandoning the sinking ship, a number of ICG's employees decided to leave ICG and were ultimately hired by Movement."  Id.  As a result, the Complaint alleges the following:

> On March 28 and 29, 2022, ICG sent a letter to each Plaintiff unequivocally stating that ICG will be filing suit against each of them to include claims for allegedly breaching, inducing others to breach, and/or tortiously interfering with the Agreements between the Individual Plaintiffs and ICG, as well as the misappropriation of ICG's confidential information.  . . . By virtue of these claims, ICG intends to enforce the forum selection clauses contained in the Agreements against all Plaintiffs (without regard as to whether any particular Plaintiff is or is not a signatory to an Agreement).

(Document No. 1, p. 8).

Plaintiffs' Complaint seeks a declaratory judgment that the forum selection clauses included in the Individual Plaintiffs' employment agreements (the "Agreements") with Defendant ICG are void to the extent they require or permit litigation to occur outside of North Carolina. (Document No. 1, pp. 9-10) (citing Document Nos. 1-2 through 1-48);  see also (Document No. 39, p. 2).

"Intercontinental Capital Group, Inc.'s Answer, Affirmative Defenses, And Counterclaim" (Document No. 5) was filed on May 3, 2022.  In its defense, ICG first asserts that "Plaintiffs' claim for declaratory judgment is barred by the doctrine of mootness."  (Document No. 5, p. 12).  ICG states that it "reserves its right to initiate arbitrations against any Individual Plaintiffs pursuant to their respective mandatory arbitration agreements," but "represents that **it will initiate any such arbitrations in the State of North Carolina**."  Id.  (emphasis added).  As such, ICG contends "there is no actual or immediate controversy with this Court's jurisdiction that it can or should decide in connection with Plaintiffs' Complaint for Declaratory Judgment."  Id.

In addition, ICG asserts counterclaims against Movement, Matt Drexler ("Drexler"), and Laura Ashley Brooks ("Brooks"). (Document No. 5, p. 12). Drexler was employed as Branch Manager of ICG's Charlotte Branch until his resignation on February 25, 2022; and Brooks was employed as ICG's Chief Marketing Officer, until her resignation on March 1, 2022. (Document No. 5, p. 15). ICG contends that "[t]his case is a textbook example of a company (Movement) illegally stealing what it could not buy." (Document No. 5, p. 13). According to ICG, after negotiations between the parties regarding the potential purchase of ICG's direct mortgage loan division were terminated, "Movement engaged in a coordinated and deceptive scheme, assisted by certain then-current ICG officers and employees, to misappropriate nearly all of ICG's consumer direct division, the effect of which was to destroy ICG's valuable consumer direct business." Id.

ICG's counterclaims include: (1) breach of contract (against Movement); (2) breach of contract (against Drexler); (3) tortious interference with contract (against Movement); (4) breach of fiduciary duty (against Brooks); (5) breach of fiduciary duty (against Drexler); and (6) unfair and deceptive trade practices (against Movement). (Document No. 5, pp. 35-43).

Movement Mortgage, LLC's Answer, Defenses, And Affirmative Defenses To Intercontinental Capital Group, Inc.'s Counterclaim" (Document No. 18) was filed on June 10, 2022.

On March 8, 2023, the undersigned issued a "Memorandum And Recommendation" (Document No. 73) (the "M&R") recommending that "Certain Individual Plaintiffs' Motion For Voluntary Dismissal Without Prejudice" (Document No. 38) be granted. The M&R also recommends that Certain Individual Plaintiffs be required to meet a few conditions related to discovery requests from ICG. See (Document No. 73, pp. 10-11). No objections to the M&R have been filed, and the time do so has lapsed.

Now pending before the Court are three (3) discovery-related motions brought by Plaintiff/Counterclaim Defendant Movement Mortgage, LLC. (Document Nos. 41, 49, and 57). These motions are ripe for review and disposition.

## I. STANDARD OF REVIEW

Rule 26 of the Federal Rules of Civil Procedure provides that:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed.R.Civ.P. 26(b)(1). The rules of discovery are to be accorded broad and liberal construction. See Herbert v. Lando, 441 U.S. 153, 177 (1979); and Hickman v. Taylor, 329 U.S. 495, 507 (1947). However, a court may "issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense." Fed.R.Civ.P. 26(c)(1).

Whether to grant or deny a motion to compel is generally left within a district court's broad discretion. See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 929 (4th Cir. 1995) (denial of motions to compel reviewed on appeal for abuse of discretion); Erdmann v. Preferred Research Inc., 852 F.2d 788, 792 (4th Cir. 1988) (noting District Court's substantial discretion in resolving motions to compel); and LaRouche v. National Broadcasting Co., 780 F.2d 1134, 1139 (4th Cir. 1986) (same).

## II. DISCUSSION

### A. "Movement Mortgage, LLC's Motion To Compel Discovery" (Document No. 41)

Plaintiff Movement seeks to compel document production from Defendant ICG that is responsive to Movement's "First Requests for Production of Documents." (Document No. 41, p. 1); <u>see also</u> (Document No. 41-3). Specifically, Movement argues that ICG should be compelled to more fully respond to Request Nos. 5, 6, 10, 12, 61-67, and 69-71. <u>Id.</u>

Movement argues that "ICG seeks lost profits among its damages" based on allegations that Movement stole ICG's employees. (Document No. 41-1, p. 2). Movement suggests that ICG's damages claim places "its financial condition directly at issue." <u>Id.</u> According to Movement, ICG has resisted "producing basic and important documents about its financial health." <u>Id.</u>

In addition to arguing that detailed information about ICG's financial condition is relevant, Movement also argues that the requested information should be compelled because ICG has only provided "boilerplate objections without specificity" which constitutes "a waiver of its right to object." (Document No. 41-1, p. 12) (citing <u>Mainstreet Collection, Inc. v. Kirkland's, Inc.</u>, 270 F.R.D. 238, 240 (E.D.N.C. 2010)).

In response, ICG suggests that this pending motion "is an unnecessary detour from the merits of this action" and asserts that it has agreed "to produce the precise types of 'financial information' Movement now seeks." (Document No. 44, pp. 1-3). ICG further states that it "has agreed herein to produce non-privileged documents responsive to certain additional requests, rendering those requests moot." (Document No. 44, p. 3). Moreover, ICG notes that it "has already agreed to search for and produce voluminous information concerning its financial condition." (Document No. 44, p. 6).

As noted above, the Federal Rules state "that Parties may obtain discovery regarding any nonprivileged matter that is **relevant to any party's claim or defense and proportional** to the

needs of the case." Fed.R.Civ.P. 26(b)(1) (emphasis added). Movement's only claim in this action seems to be for a declaratory judgment that forum selection clauses in Agreements between ICG and the Individual Plaintiffs are void to the extent they seek to bring any proceeding against the Individual Plaintiffs outside of North Carolina. (Document No. 1).

Movement, has not sought to voluntarily dismiss the Complaint, although it notes that ICG and Movement's "Confidentiality Agreement" (Document No. 1-1) "contains a mandatory North Carolina forum selection clause." (Document No. 1, p. 6); see also (Document No. 1-1, ¶10) ("Any legal suit, action, or proceeding relating to this Agreement must be instituted in the federal or state courts located in Charlotte, Mecklenburg County, North Carolina"). It is unclear to the undersigned what relief Movement seeks through its Complaint; and it seems unlikely that it has standing to assert any claim related to Individual Plaintiffs' Agreements with ICG.

As noted above, the Counterclaims by ICG against Movement include: (1) breach of contract related to the parties "Confidentiality Agreement" (Document No. 1-1); (2) tortious interference with contract related to Movement's alleged interference with the Individual Plaintiffs' employment contracts with ICG; and (3) unfair and deceptive trade practices related to an alleged scheme by Movement to steal ICG's employees, customers, and/or confidential information. See (Document No. 5, pp. 27-36, 38-39, 42-43).

Movement's "First Requests for Production of Documents" includes seventy-nine (79) requests for production of documents. See (Document No. 41-3). Movement's "Second Request For Production Of Documents" seeks eleven (11) more categories of documents. See (Document No. 44-6). The instant motion seeks to compel additional information regarding twelve (12) of those "First Requests…." (Document No. 41).

The undersigned will briefly address the Requests in dispute and determine whether the Requests are relevant to Movement's claims or defenses and proportional to the needs of the case.

1. Request Nos. 5 and 6

Movement asserts that ICG "previously engaged in negotiations to sell its direct-to-consumer lending division to two other entities, Guaranteed Rate and AmeriSave, before it engaged in negotiations to sell the same division to Movement."  (Document No. 41-1, p. 8). Request Nos. 5 and 6 seek "all documents reflecting or referring to discussions between ICG and" Guaranteed Rate and AmeriSave "relating to the potential sale of ICG's direct-to-consumer division."  (Document No. 41-3, p. 6).  Movement contends that these Requests seeking all documents related to ICG's other negotiations, including documents regarding ICG's finances and business performance, "are directly relevant to ICG's claims and damages against Movement." (Document No. 41-1, p. 8).

In response, ICG states that following comments from Movement that the communications about valuations it sought were relevant to damages, "ICG agreed to produce documents reflecting ICG's valuations of its consumer direct division in connection with these Requests."  (Document No. 44, p. 14).  In addition, ICG has agreed to "produce non-privileged documents responsive to Requests 5-6 that hit on" "search terms 'Guaranteed Rate' and 'AmeriSave' for time period of November 1, 2021 to January 1, 2022."  Id.

Movement's reply indicates that it is not satisfied with ICG's proposed production.  In part, Movement notes that most, if not all, of ICG's negotiations with Guaranteed Rate and AmeriSave occurred prior to November 1, 2021.  (Document No. 45, pp. 10-11).  Moreover, Movement is not persuaded that ICG's proposed search terms "would capture relevant and responsive documents." (Document No. 11).

8

The undersigned agrees with ICG that Requests 5 and 6 are overly broad and unduly burdensome. Movement's unwavering demand for "*all* documents reflecting or referring to discussions between ICG" and Guaranteed Rate and AmeriSave "relating to the potential sale of ICG's direct-to-consumer division" does not appear to be proportional to the needs of this case. Moreover, the demand for all such documents does not seem relevant or proportional to ICG's claims for damages, particularly since it appears that ICG has otherwise agreed to provide information about its finances and business performance.

To the extent Movement is seeking representations about ICG's valuations in its negotiations with third parties, ICG has agreed to "to produce documents reflecting ICG's valuations of its consumer direct division in connection with these Requests." (Document No. 44, p. 14). The undersigned finds ICG's proposed document production to be reasonable. However, the undersigned will direct the production of documents reflecting ICG's representations of its valuations and finances to the named third parties for a period of time from **September 1, 2021, through March 1, 2022**. Id.

2. Request No. 10

In Request No. 10, Movement seeks "all documents reflecting amounts owed or owing by ICG to vendors, suppliers, contractors, and any other third parties between the dates of November 21, 2021 and March 31, 2022." (Document No. 41-3, p. 7). Movement acknowledges that ICG has agreed to produce "documents sufficient to show the amounts of accounts payable to third parties," but Movement suggests that it is uncertain what ICG means by "accounts payable." (Document No. 41-1, p. 8).

In its response, ICG explains that it "noted that it was standing on its objections to the portion of the Request for 'all documents,' because that portion of the Request sought documents

and communications regardless of any relevance to the claims or defenses in the action."

(Document No. 44, p. 15). ICG asserts that it explained its objections to Movement as follows:

> As drafted, this request calls for all contracts, invoices, daily/monthly emails and other unspecified documents concerning any amount owed (no matter how large or small) to dozens if not hundreds of ICG's vendors, suppliers, contractors, or any other third parties for any reason. This request is grossly overbroad, irrelevant, and disproportionate to the needs of the case. As stated, ICG is willing to produce documents sufficient to show the amounts of its accounts payable to third parties between November 1, 2021 and March 31, 2022. If Movement believes it needs other documents, please specifically identify those documents. It is Movement's burden to draft a request that is properly tailored to the claims and defenses in this case. ICG otherwise stands on its objections.

(Document No. 44, p. 15) (quoting Document No. 44-12, p. 3).

In short, ICG argues that the request for "all documents" is overly broad. Id. ICG also asserts that it "has already agreed to produce documents sufficient to show its revenues, expenses, assets, and liabilities in fiscal years 2020 through the present." (Document No. 44, p. 16). ICG contends that "'accounts payable' is a commonly-used and understood financial term that refers to a company's short-term obligations owed to its creditors and suppliers." (Document No. 44, p. 16, n. 6).

In reply, Movement argues that ICG's definition of accounts payable does not provide all documents it seeks because "Request No. 10 seeks all debts during a five-month period, not simply those ICG considers 'short-term.'" (Document No. 45, p. 12). Movement observes that ICG has agreed to "produce documents sufficient to show its revenues, expenses, assets, and liabilities in fiscal years 2020 to present," but suggests that ICG's response indicates that it is still withholding relevant documents. Id.

The undersigned directs that ICG shall provide the document production responsive to Request No. 10 as it has proposed – "documents sufficient to show the amounts payable to third

parties." (Document No. 44, p. 15). However, ICG shall either supplement such production to provide documents reflecting the amounts of accounts payable to third parties between **September 1, 2021, and March 31, 2022**, or provide written confirmation that documentation of all such debt information has been provided.

3. Request No. 12

Request No. 12 seeks "all communications and documents referring or relating to Leads2Sales" . . . which may be correctly named "'Leads to Sales' or some other iteration; this Request is intended to capture all entities with and iteration of this name." (Document No. 41-3, p. 7). The Request also specifically seeks "all invoices from Leads2Sales and all payments made to Leads2Sales." (Document No. 41-3, p. 8).

In support of its motion to compel, Movement explains that it "learned from a former ICG executive that "Leads2Sales' (or 'Leads to Sales") is/was a shell company that ICG's founding partner and Chief Executive Officer, Dustin DiMisa, used to funnel millions of dollars away from ICG for his personal, tax-free benefit." (Document No. 41-1, p. 9). "Whether and to what extent ICG was paying millions of dollars to its CEO (whether improperly or not) goes directly to ICG's financial viability and fiscal management." Id.

In response, ICG argues that Movement's request is an improper attempt "to fish through ICG's records for evidence of some purported wrongdoing." (Document No. 44, p. 17). ICG then states that it "informed Movement that **no entity called 'Leads2Sales' or 'Leads to Sales' exists**" and argues that "Movement does not even know the name of the entity about which it is seeking information." Id. (emphasis added). ICG further suggests that the Request is overly broad because it is not limited to ICG's financial condition or limited by any timeframe. Id.

In reply, Movement argues that ICG should not be allowed to "avoid its discovery obligations by projecting ignorance when it knows exactly which entity Movement is referring to." (Document No. 45, p. 13). Movement re-asserts that the purpose of discovery is to allow such inquiries. Id.

Also related to Request No. 12 is "Movement Mortgage, LLC's Motion For Sanctions…" (Document No. 57) filed on February 13, 2024. The motion for sanctions will be discussed in greater detail below, but importantly, it is based on Movement uncovering in ICG's document production that there is (or was) a vendor that ICG made payments to in at least 2020, 2021, and 2022, identified as "Leads To Sales Marketing." (Document No. 57-1, p. 4) (citing Document No. 64-1, p. 2; Document No. 64-2, p. 18). Movement states that it "recently discovered documents in ICG's production that reveal ICG's representation to be intentionally misleading, if not outright false." Id.

Based on Movement's arguments in its motion to compel, as well as the additional briefing related to Request No. 12, the undersigned finds that ICG must provide a response to Request No. 12. Specifically, ICG shall provide documents showing all payments to, and invoices from, "Leads2Sales," "Leads To Sales," "Leads To Sales Marketing, Inc.," "LTL Marketing, Inc.," and any other iteration of "Leads To Sales," and any successor to any such entity or similarly named entity, for the period of **January 1, 2020, through March 1, 2022**.

### 4. Request No. 61

Plaintiff Movement's Request No. 61 seeks "all reporting materials (including but not limited to all warehouse lending certificates) provided by ICG to any warehouse banking institution in 2020, 2021, and 2022." (Document No. 41-3, p. 20). Movement contends that such

information will "demonstrate how ICG represented its financial status to financial institutions, both for loans and other purposes." (Document No. 41-1, p. 9).

In its opposition, ICG first offers a brief explanation of "warehouse lending":

> Warehouse lending is common in the mortgage industry. Warehouse lending institutions provide lines of credit to mortgage originators like ICG (and Movement), and the funds from such credit lines are used to fund mortgages originated by the non-bank mortgage lenders. The life of a loan under a warehouse line generally extends from the origination of the mortgage loan to the time it is sold on the secondary market—often just a matter of days.

(Document No. 44, p. 18) (citation omitted).

ICG argues that the pleadings do not refer to warehouse banking institutions, "nor is there any allegation that any Plaintiff left ICG because of concerns about its reporting to such warehouse lenders." Id. ICG contends that Movement's request is part of a "fishing expedition" "for some sort of speculative wrongdoing." Id. ICG concludes that this "Request has no relevance to the claims and defenses in this action," and that it has already agreed to provide Movement with detailed financial information. (Document No. 44, p. 19).

In reply, Movement re-asserts that the requested documentation is relevant to ICG's debts and financial condition. (Document No. 45, p. 14). Movement also contends that the Request is relevant to ICG's credibility and the reasons its former employees left ICG. Id.

The undersigned agrees that this Request, seeking *all* documents provided to *any* warehouse banking institution between 2020 and 2022, is overly broad, unduly burdensome, and not proportional to the needs of this case. The undersigned will respectfully decline to require further action in response to Request No. 61.

5. Request Nos. 62-67

As noted by Movement, Request Nos. 62-67 each "relate to Employee Retention Credits ("ERC") from the Internal Revenue Service sought and/or received by ICG (and third-party advance payments to ICG related to same)." (Document No. 41-1, p. 9). "Generally speaking, an ERC is a 'broad-based refundable tax credit designed to encourage employers to keep employees on their payroll.'" (Document No. 44, p. 19).

Movement contends that it has learned from multiple former ICG employees that ICG's founding partner and Chief Executive Officer, Dustin DiMisa ("DiMisa"), represented to ICG employees that ERC funding "would be used to fund the business during the downturn in the mortgage industry." (Document No. 41-1, p. 9). According to Movement, "[t]he tens of millions of dollars of third-party ERC funding received by ICG were, however, not used for the business and were most likely used by DiMisa in his personal cap[a]city." Id. Movement suggests that documents related to ERC funding sought and/or received by ICG are relevant to ICG's financial condition during the relevant time period. Id.

In response, ICG asserts that Movement's own explanations show that these Requests are intended for an improper purpose – to fish for evidence of some purported wrongdoing. (Document No. 44, p. 19). ICG notes that there is no mention of ERC in any pleadings, and no allegation that any Plaintiff left ICG related to ERC funding. Id. ICG further notes that it "has already agreed to produce documents sufficient to show any government or economic impact payments received by ICG from January 1, 2020 through March 1, 2020," including any ERC funding. (Document No. 44, p. 20).

In reply, Movement argues that the documents ICG has agreed to produce are insufficient because Movement also seeks information about "how funds would be and were used, plans for

the same, advances on ERC funding, and endeavors to siphon off any moneys related to ERC funding." (Document No. 45, p. 14).

The undersigned again finds Movement's Requests overly broad, unduly burdensome, and disproportionate to the needs of this case. As such, the Court will direct ICG to produce documents as promised, but with modification of the time period. In response to Request Nos. 62-67, ICG shall provide documents sufficient to show any Government or economic impact payments received, including ERC funding, **between January 1, 2021, and March 1, 2022**.

6. Request Nos. 69-71

These Requests seek documents relating to "ICG's sale of Proven Mortgage," "the purchase, operations, and closure of OwnIt Mortgage," and any matters between ICG and eQualify. (Document No. 41-3, pp. 22-23). The parties have subsequently reached an agreement as to document production related to Request Nos. 69 and 71, but not Request No. 70 related to OwnIt Mortgage. See (Document No. 45, p. 15).

Movement contends that the requested information regarding OwnIt Mortgage, a subsidiary of ICG, is "squarely relevant to the employment of former ICG employees and the financial condition of both ICG and its direct-to-consumer lending division, which in turn are relevant to the parties' claims and defenses." (Document No. 41-1, p. 17).

ICG still opposes Request No. 70 and argues that "by its plain language, it seeks every document ever created relating to OwnIt Mortgage, including 'all documents' relating to the 'operations' of that entity without any timeframe restriction and without regard to whether any such documents have any relevance to the claims and defenses in this action." (Document No. 44, p. 21). ICG asserts that Movement has "made no attempt to narrow or properly tailor this Request." Id.

In reply, Movement asserts that "ICG's Position is a willful overreading of Request No. 70" and suggests that it is only seeking documents relating to OwnIt's relationship with ICG and its financials. (Document No. 45, p. 14).

In short, it appears that the parties disagree as to what information is solicited by Request No. 70. Reading the plain language of the Request, the undersigned finds that it is overly broad, unduly burdensome, and disproportionate to the needs of the case. See (Document No. 41-3, p. 22). The undersigned disagrees that ICG is "overreading" the Request; rather, the Request seems to be overreaching the needs of this case. As such, the undersigned will decline to compel further action in response to Request No. 70; however, the parties are respectfully encouraged to consider some significantly narrowed document production related to OwnIt Mortgage.

Based on the foregoing, the undersigned will grant in part and deny in part Movement's "…Motion To Compel Discovery" (Document No. 41) as explained above. ICG shall provide non-privileged, responsive documents as directed above by **April 19, 2024**.

**B. "Movement Mortgage, LLC's Motion To Enforce Subpoena Directed To Third-Party Daniel Wilson" (Document No. 49)**

Next, Movement seeks to enforce a "Subpoena To Produce Documents…" (Document No. 50-1) served on third-party Daniel Wilson ("Wilson"). See (Document Nos. 49, 50, and 53). Movement notes that "Wilson was ICG's Chief Operating Officer at the time of the events relevant to this case," and that through his counsel, Wilson has confirmed he possesses documents relevant to the claims and defenses in this case. (Document No. 50, p. 2). Apparently, Wilson's counsel has assured Movement's counsel numerous times that he will produce responsive documents, but to date, Wilson's counsel has failed to do so. (Document No. 50, pp. 2-3)

Movement further notes that neither Wilson, nor any party in this case, has filed any objection to the "Subpoena To Produce Documents…" (Document No. 50-1). (Document No. 50, p. 3). The deadline to comply with the Subpoena was September 19, 2023. Movement avers that numerous depositions, including one of Wilson, need to be conducted but cannot proceed until the completion of written discovery. (Document No. 50, p. 4).

ICG filed a Response to the "…Motion To Enforce Subpoena…" on February 1, 2024. ICG argues that except for Request No. 11, "the documents requested in Movement's subpoena to Wilson all concern a 'sinking ship' defense that Movement knows lacks any legal support or justification." (Document No. 52, p. 2) (citing Document No. 50-1 p. 7).

"ICG's position is that production and review of documents responsive to Requests Nos. 1-10 in the subpoena is wasteful and unnecessary use of the parties' time and resources." (Document No. 52, p. 4). ICG contends it has already produced thousands of pages of financial statements and other documents that are more than sufficient to show ICG's financial condition during the relevant time period. (Document No 52, p. 5).

ICG also notes that it has objected to at least one category of documents demanded from Wilson, and suggests that its own objections should be considered before ordering Wilson to produce the same or similar documents. (Document No. 52, p. 5) (citation omitted).

In Reply, Movement argues that ICG's Response should be disregarded because ICG lacks standing to challenge the Subpoena. (Document No. 53, p. 2). "Generally, a party lacks standing to challenge a subpoena issued to a nonparty." Id. (citation omitted). Movement further argues that ICG's Response is untimely. (Document No. 53, p. 3).

After considering the parties' briefs, and Wilson's failure to respond, the Court in its discretion, finds that the "… Motion To Enforce Subpoena Directed To Third-Party Daniel

Wilson" should be granted with modification. See Fed.R.Civ.P. 26(b)(1) and Lone Star Steakhouse & Saloon, Inc., 43 F.3d at 929 ("This Court affords a district court substantial discretion in managing discovery").

The undersigned intends to limit Wilson's document production to be consistent with that granted in the pending "…Motion To Compel…" so that his responses are also relevant to the claims and defenses and proportional to the needs of this case. Therefore, Daniel Wilson shall provide non-privileged documents in his possession that are responsive to Request Nos. 1-3, 7-9, and 11 for the time period of **September 1, 2021, through March 1, 2022**, and to Request No. 10 for the time period of **January 1, 2021, through March 1, 2022**. See (Document No. 50-1, p. 7). Mr. Wilson is not expected to provide responses to Request Nos. 4-6. Id.

## C. "Movement Mortgage, LLC's Motion For Sanctions, Or, In The Alternative, Leave To File Supplemental Briefing And Exhibits In Further Support of Its Motion To Compel Discovery" (Document No. 57)

Finally and most recently, Movement has demanded sanctions. (Document No. 57). The undersigned referenced Movement's "…Motion For Sanctions…" above in the discussion related to Movement's "…Motion To Compel…" document production related to Document Request No. 12. In its "…Motion For Sanctions…" Movement alleges that ICG "has made intentionally misleading statements (if not outright misrepresentations) to Movement and the Court on an important discovery issue." (Document No. 57-1, pp. 1-2). As a result, Movement "now seeks appropriate sanctions for ICG's conduct, including its attorneys' fees and for the Court to overrule ICG's objections to the Request for Production at issue." (Document No. 57-1, p. 2).

The crux of the instant motion for sanctions and the underlying Request No. 12, is the allegation that DiMisa had been siphoning funds "to a shell company disguised as a vendor referred

18

to as 'Leads to Sales.'" Id.  Movement argues that "DiMisa's use of company funds in this way is directly relevant to show the extent to which the company was mismanaged and why that mismanagement led to its downfall — as opposed to any actions of Movement or any other third party." Id.

As discussed above, ICG denied the existence of any entity called "Leads to Sales" or any other iteration of that name.  (Document No. 57-1, p. 4);  see also (Document No. 44, p. 17). Nevertheless, Movement later uncovered documents confirming that ICG had made "payments to a vendor identified as 'LEADS TO SALES MARKETING' in at least 2020, 2021, and 2022." Id. (citing Document No. 64-1, p. 2;  Document No. 64-2, p. 18).

Movement argues that ICG should be sanctioned for its "misleading and evasive conduct." (Document No. 57-1, pp. 6-7) (citations omitted).  Movement further argues that sanctions are appropriate under Rule 37(c) "where a party 'fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery [under Rule 33, 34 or 36] as required by Rule 26(e)(2)."  (Document No. 57-1, p. 7) (citing Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 595 n.2 (4th Cir. 2003) (quoting Fed.R.Civ.P. 37(c)(1))).

In response, ICG primarily focuses on its objections to Request No. 12 – "an irrelevant and facially improper discovery request based on an alleged 'defense' that lacks any legal support or justification."  (Document No. 70, p. 2).  ICG further accuses Movement of meritless personal attacks and describes the instant motion as "merely an unauthorized supplemental brief in support of Movement's pending Motion to Compel."  (Document No. 70, pp. 3-4).

Next, ICG asserts that it did not make any intentional misrepresentation to Movement or the Court.  (Document No. 70, p. 4).  Rather, ICG explains that there was an entity called "Leads to Sales Marketing, Inc." that "existed for less than one week *over 11 years ago*." Id.  That entity

then changed its name to LTL Marketing. (Document No. 70, p. 5). ICG states "that the reason why 'Leads to Sales Marketing' still appears in the exhibits to the Motion is that ICG simply did not update the correct name of that entity in its accounting system after it was formally changed over 11 years ago – which ICG's counsel learned only after making the statements of which Movement now complains." Id.

In its reply brief, Movement asserts that "despite ICG's own records showing that it made substantial payments to 'Leads to Sales,' ICG claimed ignorance of the entity when it came time to produce documents related to those payments." (Document No. 72, p. 2). Movement further asserts that ICG is doubling down "on a hyper-technical justification." Id. Movement then summarizes its position as follows:

> Like the conduct that led the parties to this point, the Opposition smacks of dishonesty. ICG knows that its claim that no entity with an iteration of the name "Leads to Sales" exists was and is misleading. ICG knows that the Federal Rules do not permit a party to act dishonestly or hide the existence of responsive documents based on its objections, whether valid or not. ICG knows that Movement had to expend significant time and effort to bring ICG's conduct to light so this Court was aware of ICG's misrepresentations since ICG did not do so. And ICG knows that its specious allegations against Movement do not excuse its own misconduct. Movement's Motion should be granted, and appropriate sanctions should be leveled against ICG.

Id.

After careful consideration of the parties' briefing, the undersigned will grant Movement's "…Motion For Sanctions…" with modification. While the undersigned is not convinced that ICG's counsel was *intentionally* misleading, it certainly appears that counsel could have, and should have, done a better job of explaining the situation underlying the entities related to Request No. 12. ICG's explanation for the confusion and its stubborn denial of there being any iteration of an entity named "Leads to Sales," is too little, too late. See (Document No. 70); see also

20

(Document No. 64-1, p. 2; Document No. 64-2, p. 18). ICG's shortcomings related to Request No. 12 caused the parties and the Court to expend extra time and resources on a relatively simple discovery request, and seemed to bolster Movement's argument that the requested documents should be reviewed. Still, Movement's request is overly broad; and therefore, the Court will narrow the required document production.

As explained above in the discussion of Movement's "…Motion To Compel…," the undersigned finds that ICG must provide a modified document production in response to Document No. 12 as follows: all payments and invoices referring or relating to "Leads2Sales," "Leads To Sales," "Leads To Sales Marketing, Inc.," "LTL Marketing, Inc.," and any other iteration of "Leads To Sales" <u>and</u> any successor to any such entity or similarly named entity, for the period of **January 1, 2020, through March 1, 2022**.

In addition, ICG shall pay for Movement's reasonable costs and fees to prepare Document No. 57-1, only. Regrettably, Movement's additional motion/briefing was necessary to correct ICG's inaccurate representations that no entity with an iteration of the name "Leads To Sales" existed. The Court expects counsel to agree on an appropriate amount of reimbursement for Movement's costs and fees, but will settle any dispute if necessary.

**IT IS, THEREFORE, ORDERED** that "Movement Mortgage, LLC's Motion To Compel Discovery" (Document No. 41) is **GRANTED in part** and **DENIED in part** as described herein. ICG shall supplement its document production on or before **April 19, 2024**.

**IT IS FURTHER ORDERED** that "Movement Mortgage, LLC's Motion To Enforce Subpoena Directed To Third-Party Daniel Wilson" (Document No. 49) is **GRANTED with modification** as described herein. Daniel Wilson shall provide discovery responses on or before **April 19, 2024**.

**IT IS FURTHER ORDERED** that "Movement Mortgage, LLC's Motion For Sanctions..." (Document No. 57) is **GRANTED with modification** as described herein. ICG shall provide its responses, as well as attorney's fees and costs, on or before **April 19, 2024**.

     **SO ORDERED**.

David C. Keesler
United States Magistrate Judge